**ORAL ARGUMENT NOT YET SCHEDULED**

## No. 15-5164

_____

# In the United States Court of Appeals for the District of Columbia Circuit

_____

AMERICAN FREEDOM LAW CENTER; ROBERT JOSEPH MUISE,
*Plaintiffs-Appellants*,

v.

BARACK HUSSEIN OBAMA, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SYLVIA MATTHEWS BURWELL, in her official capacity as Secretary, U.S. Department of Health & Human Services; UNITED STATES DEPARTMENT OF TREASURY; JACOB J. LEW, in his official capacity as Secretary, U.S. Department of the Treasury; UNITED STATES DEPARTMENT OF LABOR; THOMAS E. PEREZ, in his official capacity as Secretary, U.S. Department of Labor,
*Defendants-Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
HONORABLE REGGIE B. WALTON
CASE NO. 1:14-cv-01143-RBW

_____

## APPELLANTS' BRIEF

_____

ROBERT JOSEPH MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. BOX 131098
ANN ARBOR, MICHIGAN 48113
(734) 635-3756

DAVID YERUSHALMI, ESQ.
AMERICAN FREEDOM LAW CENTER
1901 PENNSYLVANIA AVENUE NW
SUITE 201
WASHINGTON, D.C. 20006
(646) 262-0500

*Counsel for Appellants*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Plaintiffs-Appellants American Freedom Law Center and Robert Joseph Muise hereby submit the following pursuant to Circuit Rules 12 and 28(a)(1):

**1.    Parties and Amici.**

The following list includes all parties, intervenors, and amici who have appeared before the district court, and all persons who are parties, intervenors, or amici in this Court.

**Plaintiffs-Appellants:**

American Freedom Law Center

Robert Joseph Muise

**Defendants-Appellees:**

Barack Obama, President of the United States of America

United States Department of Health and Human Services

Sylvia Mathews Burwell, Secretary, United States Department of Health and Human Services

United States Department of the Treasury

Jacob J. Lew, Secretary, United States Department of the Treasury

United States Department of Labor

Thomas E. Perez, Secretary, United States Department of Labor

## 2.     Rulings Under Review.

Plaintiffs-Appellants are appealing from the order and supporting memorandum opinion of U.S. District Court Judge Reggie B. Walton entered on May 15, 2015, granting Defendants-Appellees' Motion to Dismiss and denying as moot Plaintiffs-Appellants' Motion for Preliminary Injunction. The order and memorandum opinion appear on the district court's docket at entries 24 and 25, respectively.

## 3.     Related Cases.

The instant case was never previously before this Court or any other court, other than the district court from which this case has been appealed. Plaintiffs-Appellants are not aware of any related cases pending at the appellate court level. One case pending in the district court that may involve substantially the same parties (*i.e.*, similar defendants, but not the same plaintiffs) and the same or similar issues is as follows: *West Virginia v. U.S. Dep't of Health & Human Services*, No. 14-1287 (D.D.C. filed July 29, 2014).

<div style="margin-left:auto;">

Respectfully submitted,
AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (D.C. Bar No. 978179)

*Counsel for Appellants*

</div>

ii

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Cir. Rule 26.1, Plaintiff-Appellant American Freedom Law Center, through undersigned counsel, states as follows: the American Freedom Law Center is a nonprofit corporation managed by its board of directors, all of whom are individuals. The American Freedom Law Center has no parent, subsidiary, or affiliated corporation, and no public entity has any ownership interest in the American Freedom Law Center.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (D.C. Bar No. 978179)

*Counsel for Appellants*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ....................................................vi

GLOSSARY OF TERMS .......................................................x

INTRODUCTION ...........................................................1

JURISDICTIONAL STATEMENT ...........................................2

STATEMENT OF THE ISSUES...............................................3

STATEMENT OF PERTINENT AUTHORITIES ....................................3

STATEMENT OF THE CASE................................................3

I.      Procedural History ..............................................3

II.     Statement of Facts...............................................5

        A.      The Affordable Care Act and the Individual Mandate ........................5

        B.      The Political Fallout Caused by the Affordable Care Act ...................8

        C.      Defendants' Unlawful Executive Action ...........................................10

        D.      Harm to Plaintiffs that Is Fairly Traceable to Defendants'
                Actions...............................................................14

SUMMARY OF THE ARGUMENT ....................................................20

STANDARD OF REVIEW ...................................................21

ARGUMENT ..............................................................22

I.      Defendants' Executive Action Violates the U.S. Constitution .....................22

        A.      Defendants' Executive Action Violates the Separation of
                Powers Principles of the U.S. Constitution .........................................22

        B.      Defendants' Action Violates the Equal Protection Guarantee of
                the Fifth Amendment...........................................................................25

        C.      Defendants' Action Violates the Administrative Procedure Act ........28

II.     Plaintiffs Have Article III Standing to Assert Their Claims. .......................32

        A.      This Case Presents a Real and Substantial Controversy between
                Parties with Adverse Legal Interests ...................................................32

        B.      Plaintiffs Have Suffered an Injury that Is Fairly Traceable to
                Defendants' Unlawful Conduct and Likely to Be Redressed by
                the Requested Relief.............................................................................33

        C.      The District Court Erred by Dismissing Plaintiffs' Claims on
                Standing Grounds .................................................................................38

CONCLUSION ........................................................................................................45

CERTIFICATE OF COMPLIANCE......................................................................46

CERTIFICATE OF SERVICE ...............................................................................47

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allen v. Wright*,
  468 U.S. 737 (1984) ............................................................... 34, 38, 39

*Aetna Life Ins. Co. v. Haworth*,
  300 U.S. 227 (1937) .................................................................. 32, 33

*Am. Mining Congress v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993)........................................................30

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980)........................................................31

*Bolling v. Sharpe*,
  347 U.S. 497 (1954) ......................................................................26

*Bond v. United States*,
  131 S. Ct. 2355 (2011) ..................................................................22

*Catholic Health Initiatives v. Sebelius*,
  617 F.3d 490 (D.C. Cir. 2010)......................................................... 31

*Cent. Tex. Tel. Co-op, Inc. v. FCC*,
  402 F.3d 205 (D.C. Cir. 2005)........................................................30

*Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*,
  467 U.S. 837 (1984) ......................................................................29

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ......................................................................26

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
  793 F.2d 1322 (D.C. Cir. 1986) ....................................35, 36, 37, 39, 41

*Cutler v. U.S. Dep't of Health & Human Servs.*, No. 14-5183,
  2015 U.S. App. LEXIS 14268 (D.C. Cir. Aug. 14, 2015) ............................22, 41

*Doe v. Bolton*,
   410 U.S. 179 (1973) ...................................................................................35

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
   653 F.3d 1 (D.C. Cir. 2011).................................................................. 30, 31

*Emory v. United Air Lines, Inc.*,
   720 F.3d 915 (D.C. Cir. 2013)..................................................................21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000) ............................................................................ 34, 39

*\*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) ......................................................................34, 37, 39

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
   185 F. Supp. 2d 9 (D.D.C. 2001) .............................................................38

*Kendall v. United States, ex rel. Stokes*,
   37 U.S. 524 (1838) .............................................................................. 24, 25

*Lawrence v. Texas*,
   539 U.S. 558 (2003) .................................................................................27

*Linton v. Comm'r of Health & Env't*,
   973 F.2d 1311 (6th Cir. 1992) ............................................................ 34, 39

*Lujan v. Defenders of Wildlife*,
   504 US. 555 (1992) ............................................................................ 34, 44

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .................................................................................28

*McGowan v. Maryland*,
   366 U.S. 420 (1961) .................................................................................26

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014).................................................................31

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*,
   773 F. Supp. 2d 151 (D.D.C. 2011) ...................................................29

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
   979 F.2d 227 (D.C. Cir. 1992)........................................................31

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012) .................................................................36

*Nat'l Rifle Assoc. of Am. v. Magaw*,
   132 F.3d 272 (6th Cir. 1997) .........................................................35

*Nat'l Treasury Emps. Union v. Whipple*,
   636 F. Supp. 2d 63 (D.D.C. 2009).................................................40

*New York v. United States*,
   505 U.S. 144 (1992) .....................................................................24

*NLRB v. Noel Canning*,
   134 S. Ct. 2550 (2014) ......................................................... 22, 23

*Planned Parenthood Ass'n v. City of Cincinnati*,
   822 F.2d 1390 (6th Cir. 1987)......................................................35

*Rasul v. Bush*,
   215 F. Supp. 2d 55 (D.D.C. 2002).................................................38

*Raymond v. Chi. Union Traction Co.*,
   207 U.S. 20 (1907) .......................................................................26

*Romer v. Evans*,
   517 U.S. 620 (1996) .....................................................................27

*Ross v. Moffitt*,
   417 U.S. 600 (1974) .....................................................................26

*Scandinavian Satellite Sys., AS v. Prime TV Ltd.*,
   291 F.3d 839 (D.C. Cir. 2002).......................................................38

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995) .......................................................................32

*Skinner v. Oklahoma,*
   316 U.S. 535 (1942) ...............................................................26

*Susan B. Anthony List v. Driehaus,*
   134 S. Ct. 2334 (2014) ...........................................................33

*Tremel v. Bierman & Geesing,*
   251 F. Supp. 2d 40 (D.D.C. 2003)................................... 38, 39

*U.S. Telecom Ass'n v. FCC,*
   400 F.3d 29 (D.C. Cir. 2005)..................................................30

*Util. Air Regulatory Grp. v. EPA,*
   134 S. Ct. 2427 (2014) .................................... 24, 29, 44

*Village of Willowbrook v. Olech,*
   528 U.S. 562 (2000) (per curiam) ........................... 26, 27

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...................................................... 33, 34

*Weinberger v. Wiesenfeld,*
   420 U.S. 636 (1975) ...............................................................25

*Zobel v. Williams,*
   457 U.S. 55 (1982) .................................................................43

## Constitution and Statutes

U.S. Const. art. I, § 1...............................................................1, 23, 25

U.S. Const. art. I, § 7...............................................................24

U.S. Const. art. I, § 8...............................................................1, 23, 24, 25

U.S. Const. art. II, § 1 ...............................................................23

U.S. Const. art. II, § 3 ...............................................................23, 25

U.S. Const. art. II, § 4 ...............................................................1

U.S. Const. art. III ........................................................ 4, 20, 21, 32, 33, 34, 36, 39

U.S. Const. amend. V ...................................................................25, 26, 27

U.S. Const. amend. XIV .................................................................25, 26

Healthcare and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029 (2010)
    ...........................................1, 2, 5, 7-13, 15-19, 23, 25, 27, 29-30, 32, 35-36, 43-44

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119 (2010)
    ...........................................1, 2, 5, 7-13, 15-19, 23, 25, 27, 29-30, 32, 35-36, 43-44

5 U.S.C. § 553 .........................................................................30

5 U.S.C. §§ 702-706 ............................................................. 28, 30

5 U.S.C. § 706(2) ................................................................. 28, 30

26 U.S.C. § 5000A ..........................................................5, 7, 15, 16, 42

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1331 ........................................................................2

42 U.S.C. § 18011(a)(2) ................................................................8

42 U.S.C. § 18091(2) ......................................................... 6, 36, 41

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................. 4, 38

Fed. R. Civ. P. 12(b)(6) .............................................................38

x

**Regulations**

26 C.F.R. § 54.9815-1251T ........................................................8

29 C.F.R. § 2590.715-1251 ........................................................8

45 C.F.R. § 147.140 ..................................................................8

75 Fed. Reg. 34, 538 (June 17, 2010) .......................................9

**Other Authorities**

*The Federalist No. 47* (J. Cooke ed. 1961) (J. Madison)...........................................1

Andrew C. McCarthy, *Faithless Execution* (2014) ....................................................1

_____

* Authorities on which we chiefly rely are marked with asterisks.

## GLOSSARY OF TERMS

| | |
|---|---|
| ACA | Affordable Care Act |
| AFLC | American Freedom Law Center |
| APA | Administrative Procedure Act |
| BCBSM | Blue Cross Blue Shield of Michigan |
| CMS | Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, U.S. Department of Health & Human Services |

## INTRODUCTION

> "[The] accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."

> *The Federalist No. 47*, p. 324 (J. Cooke ed. 1961) (J. Madison).

America is "a nation of laws, not of men," as John Adams aptly put it. But the rule of law is a sham if lawlessness by those who govern is unrestrained. One critical restraint on lawlessness in our system of government is the separation of powers established by our Constitution. And within this constitutional framework, the President's highest duty is the faithful execution of the laws—laws that are appropriately passed by Congress pursuant to its constitutional authority. *See* U.S. Const. art. I, §§ 1 & 8. This was the deep political truth that the Framers recognized and thus made provisions for the impeachment of an errant executive. *See* U.S. Const. art. II, § 4. It is a truth that we ignore at our peril. *See* Andrew C. McCarthy, *Faithless Execution* (2014).

This civil action seeks to preserve those structural principles enshrined in our Constitution that are designed to protect private individuals from the tyranny of government, and in particular, from the tyranny of a single branch of government that seeks to usurp power and authority not permitted under the Constitution. Thus, Plaintiffs challenge here the *ultra vires* actions of the executive branch regarding its refusal to "faithfully execute[]" the Patient Protection and Affordable

Care Act ("Affordable Care Act" or "Act"), which was passed by Congress and signed into law in 2010.

By executive fiat, President Obama and his executive agencies have licensed prohibited conduct and engaged in a policy-based, non-enforcement of federal law for an entire category of individuals and organizations subject to the law. Consequently, by altering the clear and unambiguous statutory requirements of the Affordable Care Act, including the Act's "essential" component, and thus establishing with an unconstitutional and illegal claim of executive authority that otherwise-prohibited conduct will not violate the Act, Defendants have directly harmed law-abiding citizens, including Plaintiffs, and violated the United States Constitution and the Administrative Procedure Act.

## JURISDICTIONAL STATEMENT

On July 4, 2014, Plaintiffs filed their Complaint challenging the executive actions of Defendants on federal constitutional and statutory grounds. (JA 13-31; R-1 [Compl.]). The district court had jurisdiction under 28 U.S.C. § 1331.

On September 23, 2014, Plaintiffs filed a motion for preliminary injunction, (R-9 [Pls.' Mot. for Prelim. Inj.]), and on October 17, 2014, Defendants filed a motion to dismiss, claiming that Plaintiffs lack Article III standing to advance their claims, (R-10 [Defs.' Mot. to Dismiss]).

On May 15, 2015, the district court granted Defendants' motion to dismiss, resolving all claims in Defendants' favor, and denied Plaintiffs' motion for preliminary injunction as moot. (JA 119; R-24 [Order]; JA 120-34; R-25 [Mem. Op.]).

On June 3, 2015, Plaintiffs filed a timely Notice of Appeal. (R-26 [Notice of Appeal]). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether Plaintiffs have standing to pursue their constitutional and statutory claims challenging Defendants' unlawful executive action regarding the enforcement of the Patient Protection and Affordable Care Act.

## STATEMENT OF PERTINENT AUTHORITIES

There are no pertinent statutes or regulations to set forth fully in an addendum. All relevant portions of any statute or regulation cited by Plaintiffs are set forth in the body of this brief.

## STATEMENT OF THE CASE

### I.    Procedural History.

Plaintiffs filed this action on July 4, 2014, challenging the *ultra vires* actions of the executive branch under the United States Constitution and the Administrative Procedure Act. (JA 13-31; R-1 [Compl.]). Shortly thereafter, Plaintiffs filed a motion for a preliminary injunction.

Defendants opposed Plaintiffs' motion and filed a motion to dismiss under Rule 12(b)(1), arguing that Plaintiffs lack Article III standing to assert their challenge.  (R-10 [Defs.' Mot. to Dismiss]).

Defendants argued below that Plaintiffs cannot show that they suffered any injury as a result of the challenged executive action, referring the lower court to mandatory filings by Plaintiffs' insurer, Blue Cross Blue Shield of Michigan ("BCBSM"), and noting that if the challenged actions had any impact on Plaintiffs' premiums, that information would be contained within those filings.  (*See, e.g.,* JA 70-72; R-15 [Defs.' Reply in Supp. of Mot. to Dismiss at 2 [arguing that "[w]hat Plaintiffs plainly have *not* shown . . . is that *Plaintiffs*' particular risk pool was affected by the Transitional Policy so as to result in an increase in *Plaintiffs*' premiums" and noting that "[u]nder federal regulations, Blue Cross Blue Shield of Michigan is no longer permitted to change the rates that determine Plaintiffs' premiums for the [2014] plan year . . . ."]).

Following oral argument, Plaintiffs conducted an exhaustive review of BCBSM's filings and indeed found that a basis for increasing Plaintiffs' premiums was the challenged executive action.  Plaintiffs promptly filed a motion with the lower court, requesting leave to file a supplemental brief in order to present this evidence to the court.  Plaintiffs' motion was granted.  (R-19 [Order Granting Mot. for Leave to File]).

Despite the discovery of this "smoking gun," the district court ruled that Plaintiffs lacked standing, dismissing the case without prejudice and denying Plaintiffs' request for a preliminary injunction on mootness grounds. (JA 119; R-24 [Order]; JA 120-34; R-25 [Mem. Op.]). This appeal follows.

## II.    Statement of Facts

### A.    The Affordable Care Act and the Individual Mandate.

In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), *amended* by Healthcare and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("Affordable Care Act" or "Act"). The Affordable Care Act (euphemistically called "Obamacare") is often described as the President's signature piece of legislation.

The Affordable Care Act requires, *inter alia*, each "applicable individual" to purchase health insurance ("Individual Mandate"). Individuals who fail to purchase and maintain "minimum essential coverage" required by this mandate must pay a "penalty." *See* 26 U.S.C. § 5000A(b)(1).

As set forth explicitly and unambiguously in the Act, the Individual Mandate was required to take effect on January 1, 2014. 26 U.S.C. § 5000A(a) ("An applicable individual *shall for each month beginning after 2013* ensure that the

individual, *and any dependent of the individual who is an applicable individual*, is

covered under minimum essential coverage for such month.") (emphasis added).

As support for the Individual Mandate, Congress made the following factual

findings:

> By significantly increasing health insurance coverage, the requirement, together with the other provisions of this Act, *will minimize* this **adverse selection** and *broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. The requirement is essential to creating effective health insurance markets* in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold. . . . Administrative costs for private health insurance, which were $90,000,000,000 in 2006, are 26 to 30 percent of premiums in the current individual and small group markets. By significantly increasing health insurance coverage *and the size of purchasing pools*, *which will increase economies of scale*, the requirement, together with the other provisions of this Act, *will significantly reduce administrative costs and lower health insurance premiums*. The requirement is *essential* to creating *effective health insurance markets* that do not require underwriting and eliminate its associated administrative costs.

42 U.S.C. § 18091(2)(I) & (J) (emphasis added).

The Act calls the Individual Mandate "an essential part" of the federal

regulation of health insurance and warns that "the absence of the requirement

would undercut Federal regulation of the health insurance market." 42 U.S.C.

§18091(2)(H).

Consequently, through the universal and equitable enforcement or

"execution" of the Individual Mandate, Congress (and the President by signing the

mandate into law) sought to ensure that those who purchase (and, in particular, those who are required to purchase, such as Plaintiff Muise) health insurance pursuant to the Act would directly benefit from "lower health insurance premiums" and not be burdened by the inevitably higher costs associated with purchasing and maintaining the "minimum essential coverage" required by the Act (*i.e.*, this "adverse selection"). Thus, as Congress made explicit and unambiguous in the Act, the universal enforcement of the Individual Mandate is an *essential* component of the Affordable Care Act.

Understanding the importance of the Individual Mandate to the Affordable Care Act, Congress was certain to make explicit and unambiguous in the Act those few, *limited* categories of individuals who were exempt from the mandate's requirement to purchase "minimum essential coverage" (*i.e.*, the requirement to purchase and maintain an ACA-compliant plan). *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a)(i) (providing that the mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); § 5000A(d)(2)(a)(ii) (providing that the mandate does not apply to members of a "health care sharing ministry" that meets certain criteria); § 5000A(d)(3) (providing that the mandate does not apply to "[i]ndividuals not lawfully present"); § 5000A(d)(4) (providing that the mandate

does not apply to "[i]ncarcerated individuals"). None of these exemptions apply to Plaintiffs. (JA 29; R-9-1 [Muise Decl. ¶ 29]).

The Affordable Care Act also does not apply to so-called "grandfathered" health care plans. The Act's default position, however, is that an existing health care plan is *not* a grandfathered plan. *See* 42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140. Plaintiffs' health care plan is not a grandfathered plan under the Affordable Care Act. Indeed, the plan did not exist prior to March 23, 2010. (JA 34; R-9-1 [Muise Decl. ¶ 9]).

**B.      The Political Fallout Caused by the Affordable Care Act.**

In 2013, President Obama promised the American people that "if you like your health care plan, you can keep it." However, this promise was contrary to the clear and unambiguous language of the Act. As a result, the Pulitzer Prize winning PolitiFact.com declared President Obama's promise to be the "lie of the year" for 2013. *See* http://www.politifact.com/truth-o-meter/article/2013/dec/12/lie-year-if-you-like-your-health-care-plan-keep-it/ (last visited on Aug. 27, 2015); *see also* http://www.whitehouse.gov/health-care-meeting/proposal/titlei/keepit (last visited on Aug. 27, 2015) (stating, "If You Like the Insurance You Have, Keep It"). (JA 36; R-9-1 [Muise Decl. ¶ 14]).

Indeed, in October 2013, the Department of Justice filed a brief in the lower court, stating that "under the grandfathering provision, it is projected that more group health plans will transition to the requirements under the regulations as time goes on.  Defendants have estimated that *a majority of group health plans* will have *lost* their grandfather status *by the end of 2013*."  (emphasis added).  Defs.' Mem. in Supp. of Opp'n to Pls.' Mot. for Summ. J. at 27, *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 1:13-cv-1261-EGS (D.D.C. Oct. 17, 2013), ECF No. 14-2; *see also* 75 Fed. Reg. 34,538, 34,552-53 (June 17, 2010) (estimating that between 39 percent to 69 percent of "All Employer Plans" would be cancelled by 2013).  (JA 36-37; R-9-1 [Muise Decl. ¶ 15]).

Thus, as a direct result of the Affordable Care Act, in 2013 millions of Americans received notices that their health insurance was cancelled.  This caused a political firestorm because it was contrary to President Obama's public promise to the American people.  *See* http://www.politico.com/story/2013/11/obamacare-finally-gets-real-for-america-at-least-35-million-health-insurance-policies-cancelled-99288.html (last visited on Aug. 27, 2015).  (JA 36-37; R-9-1 [Muise Decl. ¶¶ 14, 16]).

Consequently, as a politically expedient measure, President Obama, through his executive agencies, engaged in a series of executive actions that materially altered the Affordable Care Act without approval from Congress.

- 9 -

### C.     Defendants' Unlawful Executive Action.

By executive fiat and as set forth further below, Defendants altered the requirements of the Affordable Care Act and thus established with an unconstitutional and illegal claim of executive authority that otherwise-prohibited conduct—in particular, maintaining *non-compliant* health care plans—will not violate the Act.

In November 2013, and in response to the political fallout associated with the cancellation of health insurance for millions of Americans, President Obama announced a "transitional policy" that would allow millions of Americans whose insurance companies cancelled their health care coverage to remain in their non-compliant plans contrary to the express and unambiguous language, purpose, and intent of the Affordable Care Act and Congress.  (JA 37-38, 42-45; R-9-1 [Muise Decl. ¶ 19, Ex. A]).

President Obama's unlawful "transitional policy" was detailed in a November 14, 2013, letter sent to state insurance commissioners by the Director of the Center for Consumer Information and Insurance Oversight, which is part of the Department of Health and Human Services.  (JA 37-38, 42-45; R-9-1 [Muise Decl. ¶ 19, Ex. A].  Through executive fiat, President Obama unilaterally changed the Affordable Care Act by declaring that health insurance policies that were not in compliance with the Act were now in compliance, thereby effectively repealing the

Affordable Care Act for millions of Americans, but not for others, including
Plaintiffs. (JA 37-38, 42-45; R-9-1 [Muise Decl. ¶¶ 19-22, Ex. A]).

In this letter, President Obama, through his executive agency, the
Department of Health and Human Services, acknowledged that "[s]ome
individuals and small businesses with health insurance coverage have been notified
by their health insurance issuers that their coverage will soon be terminated. We
understand that, in some cases, the health insurance issuer is terminating or
cancelling such coverage because it would not comply with certain market reforms
that are scheduled to take effect for plan or policy years starting on or after January
1, 2014." (JA 38, 42-45; R-9-1 [Muise Decl. ¶ 20, Ex. A]). Consequently, by
executive fiat and contrary to the express and unambiguous language of the Act,
Defendants authorized "health insurance issuers . . . to continue coverage that
would otherwise be terminated or cancelled" for failing to comply with the Act and
further permitted, without authority and contrary to the Act, "affected individuals
and small businesses . . . to re-enroll in such coverage." (JA 38, 42-45; R-9-1
[Muise Decl. ¶ 21, Ex. A]).

The letter further states that "[u]nder this transitional policy, health
insurance coverage in the individual or small group market that is renewed for a
policy year starting between January 1, 2014, and October 1, 2014, and associated
group health plans of small businesses, will not be considered out of compliance"

with the Affordable Care Act in direct contravention to the clear and unambiguous language of the Act.  The letter also states that "[w]e will consider the impact of this transitional policy in assessing whether to extend it beyond the specified timeframe."  (JA 38, 42-45; R-9-1 [Muise Decl. ¶ 22, Ex. A]).

On December 19, 2013, and pursuant to executive action, the Department of Health and Human Services, through the Center for Consumer Information and Insurance Oversight, issued another directive that is contrary to the clear and unambiguous language of the Affordable Care Act.  This directive provides a further exemption from the penalty for not having health insurance for consumers whose policies will not be renewed because they do not comply with the Act.  It states, in relevant part, that "[i]f you have been notified that your policy will not be renewed, you will be eligible for a hardship exemption and will be able to enroll in catastrophic coverage.  If you believe that the plan options available in the Marketplace in your area are more expensive than your cancelled health insurance policy, you will be eligible for catastrophic coverage if it is available in your area. In order to purchase this catastrophic coverage, you need to complete a hardship exemption form, and indicate that your current health insurance policy is being cancelled and you consider other available policies unaffordable."  To take advantage of this unlawful policy, an insured must "submit the following items to an issuer offering catastrophic coverage in your area: (1) the hardship exemption

form; and (2) supporting documentation indicating that your previous policy was cancelled." (JA 38-39, 46-48; R-9-1 [Muise Decl. ¶¶ 23, 24, Ex. B]).

On March 5, 2014, the Director of the Center for Consumer Information and Insurance Oversight confirmed the "transitional policy" previously announced by President Obama. Moreover, in this letter, the Director, on behalf of Defendants, stated, "We have considered the impact of the transitional policy and will extend our transitional policy for two years—to policy years beginning on or before October 1, 2016, in the small group and individual markets." (JA 39, 49-56; R-9-1 [Muise Decl. ¶¶ 25, 26, Ex. C]). Thus, Defendants' unlawful revision and modification of the Act extends to 2016.

The March 5th letter concludes by stating, "On December 19, 2013, CMS issued guidance indicating that individuals whose policies are cancelled because the coverage is not compliant with the Affordable Care Act qualify for a hardship exemption if they find other options to be more expensive, and are able to purchase catastrophic coverage. This hardship exemption will continue to be available until October 1, 2016, for those individuals whose non-compliant coverage is cancelled and who meet the requirements specified in the guidance." Thus, Defendants extended their unlawful "hardship exemption" until October 1, 2016—an exemption that is contrary to the purpose, intent, and language of the Affordable Care Act. (JA 39, 49-56; R-9-1 [Muise Decl. ¶ 27, Ex. C]).

**D.    Harm to Plaintiffs that Is Fairly Traceable to Defendants' Actions.**

Plaintiff AFLC is a nonprofit corporation that has offices in Arizona, California, Michigan, New York, and Washington, D.C.  It is recognized by the Internal Revenue Service (IRS) as a 501(c)(3) organization.  The mission of AFLC is "to fight for faith and freedom through litigation, education, and public policy programs."  To promote its mission, AFLC prosecutes cases to, *inter alia*, advance and defend religious liberty, freedom of speech, and the sanctity of human life, and it crafts litigation to promote a limited government and a renewed federalism, which are necessary to protect and preserve freedom.  (JA 33; R-9-1 [Muise Decl. ¶¶ 3, 4]).

Plaintiff Muise is Co-Founder and Senior Counsel of AFLC.  He is a resident of Michigan, and he receives health insurance for himself and his family through AFLC.  (JA 33; R-9-1 [Muise Decl. ¶ 2]).

As part of its religious commitment grounded in Judeo-Christian social teaching, AFLC promotes the physical and spiritual health and well-being of its employees.  As part of this commitment, AFLC ensures that its employees and their families have health insurance.  (JA 33-34; R-9-1 [Muise Decl. ¶ 5]).

AFLC provides health insurance to Plaintiff Muise via a group plan purchased through BCBSM.  AFLC's plan year commences on December 1.  (JA 34; R-9-1 [Muise Decl. ¶ 6]).

- 14 -

AFLC provides its employees with health insurance that is compliant with the Affordable Care Act as passed by Congress and signed into law by President Obama.  By doing so, AFLC ensures that its employees are abiding by the law and will not be subject to penalty for failing to have an insurance policy that is not compliant with the Act.  Indeed, an "applicable individual," such as Plaintiff Muise, satisfies the "minimum essential coverage" requirement as set forth in the Act if he has an "eligible employer-sponsored plan."  26 U.S.C. § 5000A(f)(1)(B).  AFLC's health care plan is an "eligible employer-sponsored plan" under the Act.  (JA 34-36; R-9-1 [Muise Decl. ¶¶ 7, 8, 12]).

AFLC's health care plan is and will continue to be compliant with the Affordable Care Act as passed by Congress and signed into law by President Obama.  Because of the Affordable Care Act and Plaintiffs' desire and intention to abide by lawfully-enacted federal law, AFLC's health insurance premiums are higher than if they were permitted to thwart the clear and unambiguous language of the Act and choose their own, non-compliant health care plan.  Thus, complying with the "minimum essential coverage" requirement of the Act is imposing a financial burden upon, and thus a direct economic injury to, Plaintiffs.[1]  (JA 34-36; R-9-1 [Muise Decl. ¶¶ 7, 12]).

---

[1] It's important to note here that the district court's standing analysis, which was based on the court's conclusion that the injury *only* arises from the government's alleged regulation "of <u>someone else</u>," (JA 126-31; R-25 [Mem. Op. at 7-12]), was

In 2013, AFLC paid a monthly premium of $1,349.96 for Plaintiff Muise's health insurance plan. Plaintiff Muise contributed $600 per month to that premium. On December 1, 2014, the monthly premium for Plaintiff Muise's health plan—a plan which is comparable to the 2013 plan[2]—increased to $2,121.59. That is a monthly increase of $771.63 or a 57 percent cost increase. (JA 36; R-9-1 [Muise Decl. ¶ 13 n.2]).

Despite this significant increase in Plaintiffs' costs, according to the White House, "Health care price inflation is at its lowest rate in 50 years. Recent years have also seen exceptionally slow growth in the growth of prices in the health care sector, in addition to total spending. Measured using personal consumption expenditure price indices, health care inflation is currently running at just 1 percent on a year-over-year basis, the lowest level since January 1962. (Health care inflation measured using the medical CPI is at levels not seen since September

improper. Plaintiffs themselves are subject to the Affordable Care Act and its mandate to purchase an ACA-compliant plan. Failure to purchase and maintain an ACA-compliant plan subjects Plaintiff Muise to a tax "penalty." *See* 26 U.S.C. § 5000A(b)(1).

[2] While the district court was required to view the allegations in the Complaint as true and in Plaintiffs' favor, the court improperly dismissed the allegation that the plans were comparable at this early stage in the litigation and instead asserted that "[t]he two plans are plainly different." (JA 132; R-25 [Mem. Op. at 13 n.2]). Nevertheless, even if the plans are not *precisely* the same, Plaintiffs are still required to purchase the more expensive ACA-compliant plan under penalty while other "applicable individuals" are able to keep their non-compliant plans without suffering any penalty as a result of the challenged executive action, thereby causing injury to Plaintiffs.

1972.)"[3]    Consequently, the 57 percent cost increase cannot be attributed to inflation.  (JA 36; R-9-1 [Muise Decl. ¶ 13 n.1]).

Congress's explicit findings make clear that as the pool of "applicable individuals" who are required to purchase "minimum essential coverage" pursuant to the Affordable Care Act is reduced, as Defendants have done through unlawful executive action, the direct effect is to financially burden those who do maintain "minimum essential coverage," specifically including Plaintiffs, who are now suffering an economic injury directly related to Defendants' unlawful action.  (JA 35; R-9-1 [Muise Decl. ¶ 11]).

AFLC has no legal basis for terminating Plaintiff Muise's health care plan.  As a law-abiding organization, AFLC will comply with the law as passed by Congress and signed by President Obama.   To be eligible for the so-called "transitional policy," which Defendants unlawfully created via executive action, Plaintiffs would have to make materially false statements to the government, which they cannot and will not do.  (JA 40; R-9-1 [Muise Decl. ¶ 28]).

If AFLC terminated Plaintiff Muise's health care plan, Plaintiff Muise would be required under the Individual Mandate to purchase a costly individual plan or else he would be subject to the mandate's penalty, which, as a law-abiding citizen, he would pay.  Plaintiff Muise is an "applicable individual" under the Act, and he

---

[3]http://www.whitehouse.gov/sites/default/files/docs/healthcostreport_final_noembargo_v2.pdf (last visited Aug. 27, 2015).

is not qualified for any exemption from the Individual Mandate penalty.  (JA 40; R-9-1 [Muise Decl. ¶ 29]).

Michigan is one of the states in which non-compliant health insurance plans (*i.e.*, plans that are unlawful under the Affordable Care Act) are permitted pursuant to the President's "transitional policy," but only so long as the health care insurer is willing and able to provide such plans (and the "applicable individual" is willing to purchase the non-compliant plan, which Plaintiffs are not willing to do).  (JA 40, 57-58; R-9-1 [Muise Decl. ¶ 30, Ex. D]).

Thus, pursuant to the President's unlawful executive action, Michigan is a state in which the "health insurance risk pool" has been narrowed, contrary to Congress's explicit findings and intent, thereby increasing (rather than reducing) "administrative costs" and "health insurance premiums."  As a result, Plaintiffs' health insurance premium (and thus costs) increased.  (JA 40; R-9-1 [Muise Decl. ¶ 31]).

AFLC's health insurance provider, BCBSM, is not providing health insurance plans that violate the Affordable Care Act.  According to a letter Plaintiff Muise received from Mr. John Dunn, a vice president with BCBSM, the insurance company "responded to the new government mandates by creating an entire portfolio of health plan options that are both comprehensive and compliant with federal requirements."  (JA 40-41, 59-60; R-9-1 [Muise Decl. ¶ 32, Ex. E]).

Because Defendants' executive actions which permit some individuals and small businesses to maintain non-compliant health care plans in 2014 and beyond without being subject to penalty are unlawful, Plaintiffs cannot and will not go along with these *ultra vires* actions, resulting in higher costs for Plaintiffs and thereby causing an economic injury that is fairly traceable to Defendants' unlawful alterations of the statutory language of the Affordable Care Act.  (JA 41; R-9-1 [Muise Decl. ¶ 33]).

Indeed, based on BCBSM's June 2014 rate filing for policies that went into effect in 2015, and more specifically, based on an actuarial memorandum dated June 6, 2014, which was included with the filing, Plaintiffs' premiums for 2015 did increase based on "[s]ignificant drivers of the rate change," which included "[l]ower than anticipated improvement of the ACA compliant market level risk pool in 2014 and 2015 due to the market being allowed to extend pre-ACA non-grandfathered plans into 2016."  (JA 80; R-16-1 [BCBSM 2015 Rate Filing Mem. at 7]).

In its mandatory filing, BCBSM also stated the following:

Due to the enactment of the ACA, all carriers, including BCBSM, are governed by the same regulatory rating requirements.  As a result, BCBSM expects its competitive position within the small group pool to continue to improve over time.  However, due to other small group carriers extending pre-ACA non-grandfathered plans into 2016, we expect this improvement will be slower than we originally projected. In the 2014 rate filing (BBMI-129034772), we expected to improve 1% by 2014.  This assumption was based on all members in the

market enrolling in ACA plans on their 2014 plan year anniversary. We now only expect our risk profile compared to the market average to improve 0.5% in 2014 and an additional 0.5% in 2015.

(JA 86; R-16-1 [BCBSM 2015 Rate Filing Mem. at 13]).

In other words, the challenged executive action has *in fact* caused Plaintiffs' premiums to increase. And these rate increases have been established. Consequently, there is *empirical evidence* to support the congressional findings and thus Plaintiffs' claim of standing.

## SUMMARY OF THE ARGUMENT

Plaintiffs have standing to advance their statutory and constitutional challenge to the unlawful executive action at issue. Plaintiffs have suffered an injury that is fairly traceable to Defendants' unlawful actions and likely to be redressed by the requested relief.

There is no requirement under Article III that the injury sufficient to confer standing be important or large; an "identifiable trifle" can meet the constitutional minimum. Here, Plaintiffs have suffered a cognizable injury—they are subject to higher premiums *and* a penalty if they do not purchase and maintain a more costly ACA-compliant plan.

Moreover, traceability examines whether there is a causal connection between the claimed injury and the challenged conduct. Causation, however, does not require that the challenged action be the "sole" or "proximate" cause of the

harm suffered or even a "but-for cause" of the injury.  Rather, the causation inquiry for standing purposes asks simply whether the challenged action materially increased the probability of injury.  Here, it cannot be reasonably disputed that the challenged executive action materially increased the probability of injury to Plaintiffs.  Indeed, the traceability requirement is established here by congressional findings, basic economic principles, _and_ empirical evidence.

Finally, regarding redressability, the "fairly traceable" and "redressibility" requirements for Article III standing ensure that the injury is caused by the challenged action and can be remedied by judicial relief.  When, as in this case, the relief requested is simply the cessation of illegal conduct, the Court has noted that the "fairly traceable" and "redressability" analyses are identical.  Declaring that the challenged executive action violates the law will remedy the unlawful conduct and thus redress Plaintiffs' injury by ensuring that the law will be enforced as it was passed by Congress.

## STANDARD OF REVIEW

The Court reviews the grant of a motion to dismiss _de novo_, "'accepting the factual allegations made in the complaint as true and giving plaintiffs the benefit of all inferences that can reasonably be drawn from their allegations.'"  _Emory v. United Air Lines, Inc._, 720 F.3d 915, 921 (D.C. Cir. 2013) (citation omitted).

- 21 -

And "[b]ecause the district court dismissed this case at the complaint stage, [Plaintiffs] need only make a plausible allegation of facts establishing each element of standing." *Cutler v. U.S. Dep't of Health & Human Servs.*, No. 14-5183, 2015 U.S. App. LEXIS 14268, at *13 (D.C. Cir. Aug. 14, 2015).

## ARGUMENT

I.     **Defendants' Executive Action Violates the U.S. Constitution.**

Before addressing the standing question directly, we review here the substantive claims in order to put the standing issue in its proper context.

   A.     **Defendants' Executive Action Violates the Separation of Powers Principles of the U.S. Constitution.**

In *Bond v. United States*, 131 S. Ct. 2355 (2011), the Supreme Court made the following relevant observation:

> Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well.
>
> In the precedents of this Court, *the claims of individuals*—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances.

*Id*. at 2365 (emphasis added).

Indeed, in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), the Supreme Court stated:

> We recognize, of course, that the separation of powers can serve to safeguard individual liberty, *Clinton v. City of New York*, [524 U. S. 417, 449-50 (1998)] (KENNEDY, J., concurring), and that it is the "*duty of the judicial department*"—in a separation-of-powers case as in any other—"*to say what the law is*," *Marbury v. Madison*, [1 Cranch 137, 177 (1803)].

*Noel Canning*, 134 S. Ct. at 2559-60 (emphasis added).

The Constitution clearly sets forth the separation of powers between the executive and legislative branches of the federal government. Pursuant to Article II of the Constitution, the President is "vested" with the "executive power." U.S. Const. art. II, § 1. Moreover, Article II, Section 3 requires the President to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3 (emphasis added). The language in this section is mandatory. And the President "executes" the "laws," specifically including the Affordable Care Act, through his executive agencies, including the United States Department of Health and Human Services, the United States Department of the Treasury, and the United States Department of Labor, and their respective Secretaries.

Article I, Section 1 clearly states, "*All legislative powers* herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1 (emphasis added). Moreover, Article I, Section 8, clause 18 provides that Congress has the plenary authority "[t]o make *all laws* which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers of the United States, or in any

Department or Office thereof." U.S. Const. art. I, § 8, cl. 18 (emphasis added). If the President does not want to "faithfully execute[]" a law that is validly passed by Congress, his authority to do so resides solely in his authority to veto that law as provided in Article I, Section 7, clause 2, which states that "[e]very bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a law, be presented to the President of the United States; if he approves he shall sign it, but if not he shall return it, with his objections to that House in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it." U.S. Const. art. I, § 7, cl. 2.

As the Supreme Court recently affirmed, "Under our system of government, Congress makes laws and the President, acting at times through agencies like EPA, 'faithfully execute[s]' them. . . . The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But *it does not include a power to revise clear statutory terms that turn out not to work in practice*." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) (emphasis added); *see also New York v. United States*, 505 U.S. 144, 182 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment."); *Kendall v. United States, ex rel. Stokes*, 37 U.S. 524, 613 (1838)

("To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible.").

President Obama signed the Affordable Care Act into law on March 23, 2010.  Thus, on March 23, 2010, the President approved the Act as drafted and presented to him by Congress, thereby making it the law of the land.  However, through unlawful executive action, Defendants unilaterally rewrote and substantively revised the "*clear statutory terms*" of the Affordable Care Act because the Act "turn[ed] out not to work in practice."  Such action violates Article I, Sections 1 and 8 and Article II, section 3 of the Constitution, and the separation of powers principles set forth therein.

### B.    Defendants' Action Violates the Equal Protection Guarantee of the Fifth Amendment.[4]

The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).  Consequently, case law interpreting the Equal Protection Clause of the

---

[4] As demonstrated further below, the district court's failure to address standing in the context of Plaintiffs' equal protection claim is fatal to the court's ultimate conclusion.

Fourteenth Amendment is applicable when reviewing an equal protection claim arising under the Fifth Amendment's Due Process Clause, as in this case.[5]

It is axiomatic that the Equal Protection Clause embodies the principle that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) ("The guaranty of equal protection of the laws is a pledge of the protection of equal laws.") (internal quotations and citation omitted). And this constitutional guarantee applies to administrative as well as legislative acts. *Raymond v. Chi. Union Traction Co*., 207 U.S. 20, 35-36 (1907).

Supreme Court equal protection jurisprudence has typically been concerned with governmental classifications that "affect some groups of citizens differently than others." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961); *see also Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("'Equal Protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable"). Indeed, unless government action that singles out an individual or a class of individuals for adverse treatment is supported by some *rational justification*, it violates the command that the government shall not deny to any person the equal protection of the laws. *See Village of Willowbrook v.*

---

[5] This case involves an equal protection claim arising under the Due Process Clause of the Fifth Amendment because the defendants are agents of the federal government. *See, e.g., Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

*Olech*, 528 U.S. 562 (2000) (per curiam); *see also Romer v. Evans*, 517 U.S. 620, 635 (1996) (holding that "a classification of persons undertaken for its own sake" is not permitted by the Equal Protection Clause); *Lawrence v. Texas*, 539 U.S. 558 (2003) (striking down a law under rational basis review that discriminated on account of sexual preferences).

In sum, most, if not all, laws "discriminate" in some fashion. However, in order for the government to engage in such discrimination consistent with the Constitution, it must have a *legal* (even if only rational) justification for doing so. *See Romer*, 517 U.S. at 635. Here, Defendants had no authority to engage in the discriminatory enforcement of the Affordable Care Act (*i.e.,* discriminating in favor of those "applicable individuals" whose health care plans were appropriately and predictably canceled under the Affordable Care Act and those "applicable individuals" who comply with the Act)—such discrimination is contrary to the clear and unambiguous language of the Act and thus *ultra vires*; that is, beyond the authority of the executive branch. Therefore, the discrimination is irrational and unjustified as a matter of law. In short, the executive branch cannot discriminate by unilaterally and unlawfully rewriting federal law to exclude certain individuals from its proscriptions *while enforcing it against others*—such discrimination is not rational as a matter of law and thus violates the equal protection guarantee of the Fifth Amendment.

- 27 -

Because Plaintiffs are subject to penalty if they do not purchase and maintain an ACA-compliant healthcare plan pursuant to the Act, they have standing to challenge the unlawful exemption provided to those who are permitted to maintain such plans without suffering a penalty.

## C.     Defendants' Action Violates the Administrative Procedure Act.

Judicial review of agency action is governed by the Administrative Procedure Act ("APA").[6]  *See* 5 U.S.C. §§ 701 to 706; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Under the APA, a federal court may set aside agency action if it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and / or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2).

As set forth above, the executive action at issue here violates the APA because it is not "in accordance with the law," is "contrary to constitutional right [and] power," and is "in excess of statutory jurisdiction [and] authority."  5 U.S.C. § 706(2)(A), (B) & (C).

---

[6] The APA provides a statutory basis for standing in this case.  *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

Indeed, leaving aside the constitutional infirmities of the challenged executive action, Defendants possess no independent *statutory* authority to "tailor" the Affordable Care Act "to bureaucratic policy goals" by rewriting it.  To determine whether an agency has exceeded its statutory authority, the reviewing court engages in the two-step inquiry established by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984).

> *Chevron* directs the Court first to ask whether Congress has directly spoken to the precise question at issue.  If so, the inquiry is at an end; the Court must give effect to the unambiguously expressed intent of Congress.  If the statutory text is silent or unclear with respect to the particular question, the Court must then evaluate whether the agency's action is based upon a permissible construction of the statute.

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 166 (D.D.C. 2011) (internal quotations and citations omitted).

Here, there is no question that the executive action at issue directly contradicts the clear and unambiguous language of the Affordable Care Act, as well as the specific findings of Congress.  In short, President Obama has no statutory authority to materially change the Affordable Care Act.  As the Supreme Court recently stated in *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014), "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.  Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of Congress."  *Id*. at 2445 (internal

quotations and citations omitted). Here, Defendants have acted contrary to the "unambiguously expressed intent of Congress."

And to the extent Defendants argue that they did possess the authority to issue what amounts to new substantive rules—rules which materially altered the requirements of the Affordable Care Act—they did so "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). For a rule to carry "the force of law," it must be adopted pursuant to the notice and comments procedures of the APA. *See Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). Here, those procedures were not followed.

An executive agency is generally required by the APA to publish notice of proposed rulemaking in the Federal Register and to accept and consider public comments on its proposal. 5 U.S.C. § 553. Exempt from these procedural requirements are: (1) interpretative rules; (2) general statements of policy; and (3) rules of agency organization, procedure, or practice. *Id.* This Court refers to the category of rules to which the notice and comment requirements apply as "legislative rules" or "substantive rules." *See, e.g., Cent. Tex. Tel. Co-op, Inc. v. FCC,* 402 F.3d 205, 210 (D.C. Cir. 2005); *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34 (D.C. Cir. 2005).

To distinguish a legislative (or substantive) rule from an interpretive rule, this Court's inquiry "is whether the new rule effects a substantive regulatory

change to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6-7 (D.C. Cir. 2011).

 "An 'interpretative rule' describes the agency's view of the meaning of an existing statute or regulation." *Batterton v. Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980). Thus, interpretative rules clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or "merely track[]" preexisting requirements and explain something the statute or regulation already required. *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236-37 (D.C. Cir. 1992). To be interpretative, a rule "must derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) (internal quotations omitted).

 On the other hand, a legislative rule "is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy." *Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 979 F.2d at 237. "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1020-21 (D.C. Cir. 2014) (citing *Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 979 F.2d at 237). Put more succinctly, a rule is exempt from notice and

comment as an interpretative rule if it does *not* "effect a substantive change in the regulations." *Shalala v. Guernsey Mem'l Hosp*., 514 U.S. 87, 100 (1995) (internal quotation marks and citation omitted).

Here, there can be little dispute that the "rules" at issue "effect a substantive change" in the Affordable Care Act such that the notice and comment requirements applied. By failing to comply with these requirements, the challenged executive action must be set aside and, indeed, enjoined.

Having reviewed the substantive law, which demonstrates the unlawfulness of the challenged executive action, we turn now to discuss the standing issue more fully.

## II.     Plaintiffs Have Article III Standing to Assert Their Claims.

### A.     This Case Presents a Real and Substantial Controversy between Parties with Adverse Legal Interests.

The Constitution confines the federal courts to adjudicating actual "cases" or "controversies." U.S. Const. art. III, § 2. As stated by the Supreme Court:

> A justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definite determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised . . . .

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (citations omitted).

This case presents "a real and substantial controversy" between parties with "adverse legal interests," and this controversy can be resolved "through a decree of a conclusive character." *Id.* It will not require the Court to render "an opinion advising what the law would be upon a hypothetical state of facts." *Id.* In sum, it presents a "justiciable controversy" in which "the judicial function may be appropriately exercised." *Id.*

### B. Plaintiffs Have Suffered an Injury that Is Fairly Traceable to Defendants' Unlawful Conduct and Likely to Be Redressed by the Requested Relief.

In an effort to give meaning to Article III's "case" or "controversy" requirement, the courts have developed several justiciability doctrines, including standing. *See Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014). "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Id.* (internal quotations and citation omitted).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Consequently, to invoke the jurisdiction of a federal court, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

*Allen v. Wright*, 468 U.S. 737, 751 (1984).  While the necessary injury-in-fact to confer standing is not susceptible to a precise definition, it must be "distinct and palpable," *Warth*, 422 U.S. at 501, and not merely "abstract," "conjectural," or "hypothetical," *Allen*, 468 U.S. at 751.  Put another way, the injury must be both "concrete and particularized," meaning "that the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*,    504 US. 555, 560 n.1 (1992).

To that end, courts have recognized that "[a]n economic injury which is traceable to the challenged action satisfies the requirements of Article III." *Linton v. Comm'r of Health & Env't*, 973 F.2d 1311, 1316 (6th Cir. 1992); *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 184 (2000) (acknowledging that regulations injuring a plaintiff's "economic interests" create the necessary injury-in-fact). Certainly, the requirement to pay an increased premium, *no matter how slight*, or a tax "penalty" is an injury to Plaintiffs' "economic interests."

Additionally, having to pay a higher premium for an ACA-complaint plan while others are (unlawfully) exempted by Defendants from having to do so (and thus <u>not</u> subject to the tax "penalty") similarly causes an injury-in-fact for standing purposes.

Moreover, "courts have routinely found sufficient adversity between the parties to create a justiciable controversy when suit is brought by the particular plaintiff subject to the regulatory burden imposed by a statute." *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 282 (6th Cir. 1997); *Doe v. Bolton*, 410 U.S. 179 (1973); *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394-95 (6th Cir. 1987). Thus, when the plaintiff is an object of the challenged action "there is ordinarily little question that the action or inaction has caused him injury." *Defenders of Wildlife*, 504 U.S. at 561-62.

Here, there is no question that Plaintiffs are subject to the Affordable Care Act *and will be subject to penalty if they do not have an ACA-compliant plan*. And because of Defendants' unlawful executive action, the cost of this plan has increased. Moreover, Plaintiffs are subject to a penalty while other "applicable individuals" are not, and this discrimination is a direct result of Defendants' unlawful actions. Therefore, the standing question is relatively straightforward and must be answered in Plaintiffs' favor.

As this Court explained in *Center for Auto Safety v. National Highway Traffic Safety Administration*, 793 F.2d 1322 (D.C. Cir. 1986):

> As a threshold matter, the petitioners plainly have standing to bring this action in a representative capacity for members of their organizations. Their members have suffered injury-in-fact *because the vehicles available for purchase will <u>likely</u> be less fuel efficient than if the fuel economy standards were more demanding*. This injury can be traced to NHTSA's rulemaking and is likely to be redressed by

> a favorable decision.   Thus, all of Article III's requirements for standing are met.

*Id*. at 1324 (citations omitted) (emphasis added).  The district court failed to cite, let alone distinguish, *Center for Auto Safety*, which compels the conclusion that Plaintiffs have Article III standing to advance their claims.

Finally, regarding the redressibility issue, enjoining the challenged executive action will restore the statutory scheme established by Congress and the "compliant market level risk pool," thus negating a "significant driver[]" for the rate increase.  Put simply, BCBSM has sought and obtained a rate increase driven in material part by a reduction in the overall risk pool—the direct result of the illegal executive action at issue here.   Eliminating the illegal conduct will necessarily increase the overall risk pool per the legislative terms of the Affordable Care Act and thus drive down BCBSM's rate increases attributable to that conduct.

This concept is not too difficult to grasp.  If "increasing health insurance coverage and the size of purchasing pools" does not "increase economies of scale [and] significantly reduce administrative costs and lower health insurance premiums," *see* 42 U.S.C. § 18091(2)(I); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012) (stating that the purpose of the Affordable Care Act is to "increase the number of Americans covered by health insurance and decrease the cost of health care"), *then the entire regulatory scheme is pointless*, *see Ctr. for Auto Safety*, 793 F.2d at 1334-35 ("If setting a higher standard cannot result in

vehicles with increased fuel efficiency, *then the entire regulatory scheme is pointless*.") (emphasis added). As stated by this Court:

> The "fairly traceable" and "redressibility" requirements for Article III standing ensure that the injury is caused by the challenged action and can be remedied by judicial relief. When, as in this case, *the relief requested is simply the cessation of illegal conduct, the Court has noted that the "fairly traceable" and "redressibility analyses are identical*."

*Ctr. for Auto Safety*, 793 F.2d at 1334 (emphasis added).

Because the relief requested is simply the cessation of illegal conduct, then the "fairly traceable" and "redressibility" analyses are identical. And because there is no difficulty linking Plaintiffs' injury to the challenged action (*i.e.,* it is certainly "fairly traceable"), the injury can be redressed by ceasing the illegal conduct.[7] Declaring that the challenged executive action violates the law will remedy the unlawful conduct and thus redress Plaintiffs' injury by ensuring that the law will be enforced as it was passed by Congress.

---

[7] Redressing the injury does not require BCBSM to be a party to the action. Consider, for example, *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), in which the Court found that GMC had standing to challenge a tax imposed on the purchase of out-of-state natural gas. GMC was not a seller of natural gas—it was a consumer, like Plaintiffs in this case. No out-of-state seller of natural gas was a party in the case. Yet, the Court exercised its jurisdiction to hear and decide the matter (*i.e.,* GMC suffered a cognizable injury that was fairly traceable to the challenged tax and likely to be redressed by the Court). Indeed, the Court found that GMC had standing to challenge the tax because it would now "*presumably* pay[] more for the gas it gets from out-of-state producers and marketers." *Id*. at 286 (emphasis added). Here, there is no "presumption" (or "speculation") as to whether the challenged executive action will result in Plaintiffs having to pay more for their insurance—BCBSM told us so in a public filing setting forth the rates.

- 37 -

In sum, there is "little question" that Plaintiffs have standing because they have alleged a "personal injury" that is "fairly traceable" to the challenged executive action and is "likely to be redressed by the requested relief." *See Allen*, 468 U.S. at 751.

## C.    The District Court Erred by Dismissing Plaintiffs' Claims on Standing Grounds.

Defendants moved the district court to dismiss the Complaint for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure.   Rule 12(b)(1) "requires that the plaintiff bear the burden of establishing by a preponderance of the evidence that the court has jurisdiction to entertain his claims." *Tremel v. Bierman & Geesing*, 251 F. Supp. 2d 40, 43 (D.D.C. 2003) (Walton, J.); *Rasul v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002).  In considering a motion to dismiss for lack of subject-matter jurisdiction, the court is required to accept as true all of the factual allegations contained in the complaint. *Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839, 844 (D.C. Cir. 2002).  However, because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a court resolving a motion to dismiss under Rule 12(b)(1) must give the complaint's factual allegations closer scrutiny than required for a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Additionally, "it is well established in this Circuit that a court is

not limited to the allegations in the complaint, but may consider material outside of the complaint in an effort to determine whether the court has jurisdiction in the case." *Tremel*, 251 F. Supp. 2d at 43.

As noted above, the formula for establishing Article III standing is well known: "[a] plaintiff must allege personal injury[8] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. However, "[t]here is . . . no requirement that the injury be important or large; an '*identifiable trifle*' can meet the constitutional minimum. The injury need not have already occurred; it is sufficient if it is 'actual' or 'threatened.' And an injury shared by a large number of people is nonetheless an injury." *Ctr. for Auto Safety*, 793 F.2d at 1331 (finding that consumers suffered sufficient injury in fact to challenge regulations reducing fuel economy standards "because the vehicles available for purchase will likely be less fuel efficient than if the fuel economy standards were more demanding") (emphasis added).

---

[8] There can be no dispute that an economic injury (whether in the form of a higher premium or the payment of a tax "penalty") is a cognizable injury sufficient to confer standing. *Gen. Motors Corp.*, 519 U.S. at 278 (holding that consumers who suffer economic injury from a regulation prohibited under the Constitution satisfy the standing requirement); *Friends of the Earth, Inc.*, 528 U.S. at 184 (acknowledging that regulations injuring a plaintiff's "economic interests" create the necessary injury in fact to confer standing); *Linton*, 973 F.2d at 1316 (6th Cir. 1992) ("An economic injury which is traceable to the challenged action satisfies the requirements of Article III.").

- 39 -

Additionally, "[t]raceability examines whether there is a causal connection between the claimed injury and the challenged conduct, that is, whether the asserted injury was the consequence of the defendant's actions. *Causation does not require that the challenged action must be the 'sole' or 'proximate' cause of the harm suffered, or even that the action must constitute a 'but-for cause' of the injury*. . . . At its core, the causation inquiry asks whether the agency's actions *materially increase*[*d*] *the probability of injury*." *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 73 (D.D.C. 2009) (quotation marks, brackets, and citations omitted). Here, based on the evidence presented, there can be no dispute that the challenged executive action "materially increased the probability of injury" to Plaintiffs.

While Plaintiffs have received conflicting information as to how BCBSM determined their rate increase which took effect on December 1, 2014, (*see, e.g.*, JA 63; R-12-1 [Muise Suppl. Decl. ¶ 4]), what we do know for certain based on BCBSM's June 2014 rate filing is that Plaintiffs' premiums for 2015 <u>*did in fact increase*</u> based on "[s]ignificant drivers of the rate change," which expressly included "[l]ower than anticipated improvement of the ACA compliant market level *risk pool* in 2014 and 2015 *due to the market being allowed to extend pre-ACA non-grandfathered plans into 2016*." (JA 80; R-16-1 [BCBSM 2015 Rate Filing Mem. at 7] [emphasis added]). And per the BCBSM 2015 Rate Filing

Memorandum, the "rate change" for 2015 was "for <u>all</u> small group products that were offered in 2014." (JA 80; R-16-1 [BCBSM 2015 Rate Filing Mem. at 7] [emphasis added]). Thus, contrary to the district court's suggestion, (*see* JA 132; R-25 [Mem. Op. at 13] [incorrectly asserting that "the Court would have to engage in pure speculation to conclude that [Plaintiffs] are members of one of the plans that experienced an increase in premiums due to the 'significant driver' noted in the Memorandum"]), this rate change did affect Plaintiffs' small group plan.[9] *See Cutler*, 2015 U.S. App. LEXIS 14268, at *13 (stating that a plaintiff "need only make a plausible allegation of facts establishing each element of standing").

Consequently, there is nothing "speculative" about the *fact* that the challenged executive action has increased and will continue to increase Plaintiffs' premiums, as Plaintiffs alleged in the Complaint (JA 25-26; R-1 [Compl. ¶¶ 45-50]) and argued throughout based on the congressional findings and basic economic principles, s*ee* 42 U.S.C. § 18091(2). Indeed, BCBSM's filing has provided empirical evidence confirming this. (JA 80; R-16-1 [BCBSM 2015 Rate Filing Mem.]).

---

[9] As noted above, BCBSM's filing was for a rate change per member of 2.7% for 2015 for *all* small group products that were offered in 2014 (*i.e.,* Plaintiffs' healthcare plan). (JA 80; R-16-1 [BCBSM 2015 Rate Filing Mem.]). While this is not the equivalent of a 57% rate increase, for standing purposes, it more than sufficient. *See Ctr. for Auto Safety*, 793 F.2d at 1331. Indeed, this percent increase amounts to a premium increase for Plaintiffs of hundreds of dollars per year—far more than a "trifle."

- 41 -

As noted previously, the challenged executive action also creates discriminatory exemptions from the costs and burdens associated with purchasing an ACA-compliant policy. (*See* JA 26; R-1 [Compl. ¶ 49] ["Because President Obama's executive actions which permit some individuals and small businesses to maintain non-complaint health care plans in 2014 and beyond without being subject to penalty are unlawful, Plaintiffs cannot and will not go along with these *ultra vires* actions, resulting in higher costs and thus a financial burden imposed upon Plaintiffs, thereby causing an economic injury . . . ."]). Because Plaintiffs are not exempt under this unlawful executive action, it operates like a discriminatory tax against Plaintiffs. If Plaintiff Muise does not maintain an ACA-compliant policy via his employer-sponsored plan through the American Freedom Law Center, then he is subject to a tax "penalty." *See* 26 U.S.C. § 5000A.

Consequently, there are at least two separate, albeit related, analyses for standing. First, based on the undisputed congressional findings (and fundamental economic principles supported empirically by BCBSM's filing), by unlawfully reducing the "health insurance risk pool" by illegally exempting certain individuals (and their health care plans), the resulting increased financial costs and burdens to Plaintiffs (and others) who must remain in the "pool" under penalty of federal law have caused them to suffer an economic injury. And second, as a result of the challenged executive action, Defendants have unlawfully exempted some

"applicable individuals" (and their plans) from these burdens, resulting in the law being illegally applied in a discriminatory manner.  As noted, the first basis for standing has now been confirmed by BCBSM in its formal filing for a rate increase for small group plans (Plaintiffs' plan).  And the State of Michigan approved this rate increase.  The second basis for standing (unlawful discrimination) is grounded in Plaintiffs' equal protection argument.  As alleged in the Complaint, "By exempting some applicable individuals from the Individual Mandate but not others, including Plaintiffs, on a basis that violates the Constitution, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Fifth Amendment to the United States Constitution."  (JA 28; R-1 [Compl. ¶ 62]); *see Zobel v. Williams*, 457 U.S. 55, 65 (1982) (holding that Alaska's dividend distribution plan which favored some residents over others violated equal protection).[10]  Here, the challenged executive action discriminates in favor of some citizens (and healthcare plans) by unlawfully exempting them from the costs and

---

[10] In *Zobel*, a segment of Alaskan residents challenged the constitutionality of a statutory scheme by which the state distributed income derived from natural resources to the adult citizens of Alaska in varying amounts based on the length of each citizen's residency.  The Court held that the distribution plan's discrimination was invalid.  *Zobel*, 457 at 65.  However, striking down the plan did not guarantee that the challengers would receive a higher disbursement than if they had not challenged the law.  The state could have chosen to lower the disbursements so that all recipients received the lowest amount (leaving the challengers in the same position) or it could have chosen not to distribute any income whatsoever (leaving the challengers in a worse position).  However, by striking it down, the Court redressed the discrimination caused by the plan.

burdens of complying (and the penalty for not complying) with the Affordable Care Act. Plaintiffs, who are not exempt under the challenged executive action (and therefore not able to keep the plan they like), are thus subject to these increased burdens and costs (and "penalty") as a result. A judicial decree striking down the challenged executive action will remedy the discrimination. *Lujan*, 504 U.S. at 561-62 ("[I]n order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."). Amending or rewriting the Affordable Care Act to accomplish the administration's policy goals will then be left to the proper branch of government responsible for doing so: Congress (*i.e.,* not the executive branch or any court). *Util. Air Regulatory Grp.*, 134 S. Ct. at 2446 ("Under our system of government, Congress makes laws and the President . . . 'faithfully execute[s]' them. . . . The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice.") (citations omitted).

In sum, Plaintiffs have standing to advance their claims.

## CONCLUSION

Plaintiffs hereby request that the Court reverse the district court and remand the case for further proceedings.

### AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
rmuise@americanfreedomlawcenter.org
Tel: (734) 635-3756

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (D.C. Bar No. 978179)
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
Tel: (646) 262-0500
Fax: (801) 760-3901

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7), the foregoing Brief is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 10,631 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii).

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq.

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that all of the participants in this case are registered CM/ECF users. I further certify that nine (9) copies of this filing were sent this day via Federal Express overnight delivery to the Clerk of the Court.

**AMERICAN FREEDOM LAW CENTER**

*/s/ Robert J. Muise*
Robert J. Muise, Esq.

*Counsel for Appellants*